1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MODERN TELECOM SYSTEMS LLC,<br><br>      Plaintiff,<br><br>      vs.<br><br>LENOVO (UNITED STATES) INC.,<br><br>      Defendants. | Case No.: SA CV 14-1266-DOC (JEMx)<br><br><br>**ORDER RE: MOTION FOR SUMMARY JUDGMENT OF INVALIDITY PURSUANT TO 35 U.S.C. § 101 [65]** |
| LENOVO (UNITED STATES) INC., et al.,<br><br>      Counterclaimants,<br><br>      vs.<br><br>MODERN TELECOM SYSTEMS LLC,<br><br>      Counter Defendant. | |

      This case is one of two remaining related patent infringement cases concerning the same group of patents owned by Plaintiff Modern Telecom Systems LLC ("MTS" or "Plaintiff").

Now before the Court is Defendant Lenovo (United States) Inc.'s ("Lenovo" or "Defendant") Motion for Summary Judgment of Invalidity Pursuant to 35 U.S.C. § 101 (Dkt. 65).

## I.    Background

### A.    Facts and Procedural History

On August 8, 2014 Plaintiff Modern Telecom Systems LLC filed suit against Lenovo for patent infringement. Compl. (Dkt. 1). In the First Amended Complaint, filed on March 31, 2015 ("FAC") (Dkt. 43), MTS asserts claims of patent infringement of four related patents: U.S. Patent No. 6,504,886 ("the '886 patent"), issued on January 7, 2003; U.S. Patent No. 6,332,009 ("the '009 patent"), issued on December 18, 2001; U.S. Patent No. 6,570,932 ("the '932 patent"), issued on May 27, 2003; and U.S. Patent No. 7,062,022 ("the '022 patent"), issued on June 13, 2006.

In March of this year, the Court denied without prejudice related motions to dismiss and for judgment on the pleadings in three cases, addressing the same argument: that the patents in suit are patent ineligible under 35 U.S.C. § 101. Order Denying Motion to Dismiss ("MTD Order"), March 17, 2015 (Dkt. 42).[1] The motions were denied without prejudice, allowing the movants to raise the same issue at a later date after further discovery had been completed. *Id.* at 14. Later, the Court set coordinated case management dates, and pursuant to Defendant's request, set an early hearing date for renewed motions to address patent invalidity pursuant to § 101. Scheduling Order (Dkt. 52).[2] Since denying the motions, two of the related actions settled.[3] Defendant Lenovo alone brings the present motion.[4]

### B.    The Power Level Calculation Patent

---

[1] The MTD Order issued by the Court also included the parallel Order Denying Motion for Judgment on the Pleadings in *Modern Telecom Sys. LLC v. Juno Online Servs. Inc., et al.*, Case No. 8:14-cv-00348-DOC-AN. The page citations reference the pages in the *Juno* Order (Dkt. 42).

[2] Typically, for the purposes of judicial economy, the Court hears only one summary judgment motion from each party, and only after discovery in a matter has closed. The schedule in this action was a rare exception to that rule. *See* Scheduling Order (Dkt. 52) at 6 ("In general, except as otherwise provided herein, the Court will hear only one motion for summary judgment per party. Cross motions for summary judgment will all be heard on the same day, after the close of discovery. In other words, the Court will not entertain piecemeal motions for partial summary judgment before the factual record is complete.").

[3] *See Modern Telecom Sys. LLC v. Earthlink, Inc.*, Case No. 8:14-cv-00347-DOC-AN, Stipulation to Dismiss Case, July 17, 2015 (Dkt. 72); *Modern Telecom Sys. LLC v. Juno Online Servs. Inc., et al.*, Case No. 8:14-cv-00348-DOC-AN, Stipulation to Dismiss Case, July 9, 2015 (Dkt. 71)

[4] A fourth related case, *Modern Telecom Sys. LLC v. Fujitsu Limited et al.*, Case No. SACV 14-0920-DOC (ANx) is still pending. Fujitsu has not filed any motions on § 101 invalidity grounds.

The parties refer to the '932 patent as the "Power Level Calculation Patent." The Abstract of the patent states:

> A pulse code modulation modem system utilizes the same total average transmit power formula for designing signal point constellations and for verifying that the transmit power of the signal point constellations are within a designated maximum power limit. The transmit power of the signal point constellations designed by the client modem is also calculated by the server modem to verify that the transmit power limit imposed upon the server modem is not exceeded.

Declaration of Jennifer A. Trusso ("Trusso Decl.") (Dkt. 65-4) Ex. 2 ("'932 patent).

Plaintiff previously asserted that the Power Level Calculation Patents:

> teach a modem system wherein the total average transmit power of a signal point constellation set is calculated using a particular formula by an analog modem and verified by a digital modem using the same power formula. This improves upon prior art 56 kbps modem systems which may designate training sequences in advance without regard to any transmit power limitations imposed on the digital modem or current operating conditions such as the presence of robbed bit signaling or digital pads (digital impairments).

MTD Order at 4.

Put simply, this patent was designed to address a compatibility issue between digital and analog modems. *See* '932 patent at Col. 2:7–35. In layman's terms, analog modems may calculate "the total average transmit power" differently between devices. *Id.* When a digital modem communicates with an analog modem, it may use a "signal point constellation set" that exceeds the maximum transmit power limit of the analog modem due to "computational errors." *Id.* This problem arose as digital modems began transmitting to analog modems. Opp'n at 4. There was a need for a method to "verif[y] whether the total average transmit power of a set of signal point constellations [was] within a designated transmit power limit." '932 Patent at Col. 1:15–17.

As to the '932 patent, Plaintiff asserts four claims.[5] Defendant characterizes Claim 7 of the '932 patent as representative of the other claims in the patents.

---

[5] Specifically, Plaintiff asserts claims 7–9 and 11 of the '932 patent.

Claim 7 of the '932 patent recites:

> A method of communicating over a communication channel using a constellation including a plurality of signal points, said method comprising:
>
> determining a probability of transmission of each signal point of said constellation;
>
> calculating an average power of said signal points using a power formula based on said probability of transmission of each said signal point; and
>
> comparing said average power with a transmit power limit.

'932 patent at Col. 12:41–50.

## C.    The Fast Start-Up Patent

The parties refer to the '022 patent as the "Fast Start-Up Patent." The Abstract of the '022 patent states: "A fast startup procedure for a modem system utilizes known characteristics of a previously established communication channel to reduce the initialization period associated with subsequent connections over the same channel." Trusso Decl. (Dkt. 65-6) Ex. 5 ("'022 patent"). Plaintiff contends the Fast Start-Up Patent "discloses a method of achieving fast startup by determining whether characteristics of the current communication channel sought to be established are similar to stored characteristics associated with a previously-established communication channel." Opp'n at 6.

Plaintiff asserts 4 claims of the '022 patent.[6] Defendants characterize Claim 1 of the '022 patent as representative.

Claim 1 of the '022 patent recites:

> A method for reducing startup latency associated with a data transmission system having a first device configured to communicate with a second device over a communication channel, said method comprising the steps of:
>
> establishing a call between said first device and said second device;
>
> determining whether a characteristic of said communication channel is similar to a corresponding characteristic associated with a previously established communication channel; and

---

[6] Plaintiff asserts Claims 1, 2, 7, and 10 of the '022 patent.

> initializing at least one of said first and second devices using a number of stored parameters associated with said previously established communication channel, said initializing step being performed if said determining step determines that said characteristic is similar to said corresponding characteristic.

'022 patent at Col. 18:13–28.

### D.    The Learning Sequence Patents

The parties refer to the '886 patent and the '009 patent as the "Learning Sequence Patents." The Abstract of each of these two patents states:

> A modem system includes a programmable synchronization signal format that can be configured at a first modem in response to a request received from a second modem. The synchronization signal format may define a number of parameters of the synchronization signal, such as the sign pattern for symbols transmitted by the first modem during a training sequence.

Trusso Decl. (Dkts. 65-7, 65-8) Exs. 3 ("'886 patent"), 4 ("'009 patent").

The patents "relate[] generally to line probing techniques used in data communication systems [like modem systems] that transmit data between remote locations." '886 patent at Col. 1:19–23. Specifically, the patents relate to "the use of a programmable digital impairment learning signal that facilitates the selection of preferred signal points for transmission of data by a data communication system." *Id.* at Col. 1:23–25.

"Line probing," or "impairment learning techniques" refers to the process during the initialization of communication between two devices "utilized to determine the characteristics of the communication channel." *Id.* at Col. 1:30–33. Line probing signals are usually transmitted between two devices, such as between two modems, during the start-up procedure. *Id.* at Col. 1:33–35.

Plaintiff describes the process taught by the Learning Sequence Patents in the following way:

> The [digital communication] system transmits a learning sequence descriptor of a specified format and a learning signal based on the learning sequence descriptor. The receiver can then compare the known learning signal with the received signal to learn an impairment of the communication channel. The Learning Sequence Patents describe specific methods of constructing and transmitting learning sequences and learning sequence descriptors that improve impairment learning in various communication channels.

MTD Order at 3.

Plaintiff asserts the Learning Sequence Patents "describe and claim a novel form of line probing using programmable impairment learning sequences that was not performed by (non-modem) prior art systems that did not perform line probing at all, and prior art (modem) systems that performed line probing using fixed impairment learning sequences." Opp'n at 2.

Plaintiff asserts 25 claims in the '886 and '009 patents.[7] Defendants characterize Claim 1 of the '886 patent as representative of the other claims in the '886 and '009 patents. Mot. at 6.

Claim 1 of the '886 patent recites:

A method of communicating a learning sequence descriptor for use in constructing a learning sequence, said method comprising:

transmitting a first parameter specifying a number of segments in said learning sequence;

transmitting a second parameter specifying a sign pattern of each of said segments;

transmitting a third parameter specifying a training pattern of each of said segments, wherein said training pattern is indicative of an ordering of a reference symbol and a training symbol in each of said segments.

'886 patent at Col. 18:63–67, 19:1–6.

Defendant asserts, "[a]ll of the other dependent asserted claims of the '886 and '009 patents include limitations pertaining to the communication of parameters from one device to another." Mot. at 6.

## II.  Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974

---

[7] Plaintiff asserts Claims 1–4, 11, 13, 18 and 20 of the '886 patent, and Claims 44, 45, 47–52, 54, 55, 60, 61, 104–106, 108, and 109 of the '009 patent.

F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

## III.   Patent Eligibility Under 35 U.S.C. § 101[8]

### A.   Test for Patent Eligibility under *Mayo* and *Alice*

Section 101 of the Patent Act provides that a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. The Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, __ U.S. __, 134 S. Ct. 2347, 2354, 189 L. Ed. 2d 296 (2014). "The concern that drives this exclusionary principle" is "one of preemption." *Id.* In other words, the concern is "'that patent law not inhibit further discovery by

---

[8] As the basic landscape of the law has not changed measurably in the previous six months, the legal standard is drawn from the Court's previous order.

improperly tying up the future use of' these building blocks of human ingenuity." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, __ U.S. __, 132 S. Ct. 1289, 1301, 182 L.Ed.2d 321 (2012)). *Alice* warns courts, however, to "tread carefully in construing this exclusionary principle lest it swallow all of patent law," because "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1293).

In *Alice*, the Court followed the framework it established in *Mayo* "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Id.* at 2355. First, the court asks "whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* If so, the court then "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 132 S. Ct. at 1298, 1297). In this second step, the court looks for an "inventive concept" – that is, "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1294). As the Court previously noted, this standard is easier to articulate than it is to apply. "The line between a patentable 'process' and an unpatentable 'principle' is not always clear." *Parker v. Flook*, 437 U.S. 584, 589 (1978).

## B.   Defendant's Burden

Previously, the Court explained "the clear and convincing evidence standard is not necessarily applicable in the context of determining patent-eligibility under § 101, which is a question of law." MTD Order at 10. The Court ultimately concluded that, "[a]lthough the clear and convincing evidence standard is not applicable [to the Motion for Judgment on the Pleadings], Defendants, as the parties moving for relief, still bear the burden of establishing that the claims are patent-ineligible under § 101." *Id.* Consistent with its previous decision, the Court finds that Defendant Lenovo bears the burden of establishing invalidity. However, because this is a motion for summary judgment, rather than a motion for judgment on the

pleadings, the Court finds the clear and convincing evidence standard applies here. *Netflix, Inc. v. Rovi Corp.*, No. 11-CV-6591 PJH, 2015 WL 4345069, at *7 (N.D. Cal. July 15, 2015) ("[A] patent challenger bears the burden of proving invalidity by clear and convincing evidence. This standard applies equally at summary judgment.") (citations omitted); *see Cal. Inst. of Tech. v. Hughes Communc'ns, Inc.*, 59 F. Supp. 3d 974, 978 n.6 (C.D. Cal. 2014) ("*Hughes Communications*") (noting "[t]his Court believes that the clear and convincing evidence standard is not necessarily applicable in the context of determining patent-eligibility under § 101, which is a question of law," but following Federal Circuit precedent by applying clear and convincing evidence standard in context of motion for summary judgment); *cf. Blue Spike, LLC v. Google Inc.*, No. 14-CV-01650-YGR, 2015 WL 5260506, at *4 (N.D. Cal. Sept. 8, 2015) ("[O]n a motion for judgment on the pleadings for invalidity, where no extrinsic evidence is considered, the 'clear and convincing' standard for weighing evidence in determining a patent's invalidity is inapplicable."). Thus, Defendant Lenovo bears the burden of establishing, by clear and convincing evidence, that the claims are patent ineligible under § 101.

## IV.   Analysis

### A.   Step One of the *Mayo* Test

#### 1.   What Is an Abstract Idea?

Under the first step of the *Mayo* test, the Court must determine whether the patent claims at issue are directed to patent-ineligible concepts, such as abstract ideas. "A principle, in the abstract, is a fundamental truth . . . [which] cannot be patented." *Blue Spike*, 2015 WL 5260506, at *4 (citing *Gottschalk v. Benson,* 409 U.S. 63, 67 (1972)). "Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work." *Gottschalk,* 409 U.S. at 67; *see also CyberSource Corp. v. Retail Decisions, Inc.,* 654 F.3d 1366, 1371 (Fed. Cir. 2011) ("[M]ental processes are not patent-eligible subject matter because the 'application of [only] human intelligence to the solution of practical problems is no more than a claim to a fundamental principle.'").

At the first step in the *Alice* framework, the court must endeavor to "determine the breadth of the claims" in general terms in order to determine whether the claims extend to cover a "fundamental . . . practice long prevalent in our system . . . ." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015) (citing *Alice,* 134 S.Ct. at 2356). How expansively a court should examine a claim at step one of the *Alice/Mayo* framework, however, is not totally clear. For instance, in *Hughes Communications*, the court stated that, under the first step of *Mayo*, the court "must identify the purpose of the claim – in other words, what the claimed invention is trying to achieve – and ask whether that purpose is abstract." 59 F. Supp. 3d. at 991. The *Hughes Communications* court noted that the majority in *Diamond v. Diehr*, 450 U.S. 175 (1981), "took the correct approach of asking what the claim was trying to achieve, instead of examining the point of novelty," and concluded that courts "should recite a claim's purpose at a reasonably high level of generality." *Id.* at 991–92. Therefore, for the *Hughes Communications* court, step one "is a sort of 'quick look' test, the object of which is to identify a risk of preemption and ineligibility." *Id.* at 992. Only if the court concludes the purpose is abstract, will it "look[] with more care at specific claim elements at step two." *Id.* Other courts have not conducted the step-one analysis in exactly the same way as the *Hughes Communications* court. *See, e.g.*, *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258–59 (Fed. Cir. 2014) (blurring steps one and two of the *Mayo* test in analyzing internet-based patent claims).

Despite the differences in other courts' approaches, the Court is not completely without guidance as to what constitutes an abstract idea. The Supreme Court, while declining to set out the "precise contours" of the abstract idea category, has set out several basic guidelines. "We know that mathematical algorithms, including those executed on a generic computer, are abstract ideas." *DDR Holdings*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) (citing *Gottschalk v. Benson*, 409 U.S. 63, 64 (1972)). Likewise, "[w]e know that some fundamental economic and conventional business practices are also abstract ideas." *Id.* (citing *Bilski v. Kappos*, 561 U.S. 593, 611 (2010) (finding the "fundamental economic practice" of hedging to be patent ineligible)); *Alice*, 134 S. Ct. at 2356 (same for intermediated settlement).

The Federal Circuit has further developed the contours of the amorphous "abstract idea" category.

- In *Intellectual Ventures*, the Federal Circuit held that claims addressing "methods of budgeting, particularly methods of tracking and storing information relating to a user's purchases and expenses and presenting that information to the user vis-à-vis the user's pre-established, self-imposed spending limits" and "generally relate[d] to customizing web page content as a function of navigation history and information known about the user" were directed to an abstract idea. 792 F.3d 1363.

- In *OIP Technologies*, the Federal Circuit found the concept of offer-based price optimization related to a "fundamental economic concept," which courts have found to be abstract ideas. *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015)

- In *Digitech*, the Federal Circuit found a "method of generating a device profile that describes properties of a device in a digital image reproduction system for capturing, transforming or rendering an image" was directed at taking two data sets and combing them into one, and therefore it was related to "an ineligible abstract process of gathering and combining data that does not require input from a physical device." *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014).

- In *Content Extraction*, the Federal Circuit found four claims generally reciting "a method of 1) extracting data from hard copy documents using an automated digitizing unit such as a scanner, 2) recognizing specific information from the extracted data, and 3) storing that information in a memory" were "drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1345, 1347 (Fed. Cir. 2014)

- In *CyberSource*, the Federal Circuit held "a method for verifying the validity of a credit card transaction over the Internet" was directed to an abstract idea or unpatentable mental process. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370, 1373 (Fed. Cir. 2011).

- In *Ultramercial*, the Federal Circuit held that a computer-and-Internet-based implementation of displaying an advertisement in exchange for access to copyrighted media was directed to an abstract idea. *Ultramercial, Inc. v. Hulu LLC*, 772 F.3d 709, 712, 714 (Fed. Cir. 2014).

- In *buySAFE*, the Federal Circuit determined that a claim directed toward guaranteeing a party's performance in an online transaction was directed to an abstract idea. *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1351, 1355 (Fed. Cir. 2014).

Finally, the Court notes it previously expressed concern about the apparent breadth of the nebulous "abstract idea" concept, and applying it to the present case:

> [U]nder the Federal Circuit's broad formulation of the first step of the *Mayo* test, *see, e.g.*, *Ultramercial*, 772 F.3d at 715 (combination of steps in patent claim "recites an abstraction—an idea, having no particular concrete or tangible form"), one could conceivably conclude that all process or method patents, like the patents in suit, are directed to an abstract idea.

MTD Order at 12. Partially for this reason, and because it found the motion failed under step two of the *Alice*/*Mayo* framework, it did not reach the issue of whether the patents-in-suit were directed at an abstract idea. While renewing this concern and concerns about how to properly determine whether an idea is abstract, the Court finds it appropriate at this juncture to determine whether claims at issue are directed towards an abstract idea. Thus, the Court will try to get to "the gist of the claims," *Blue Spike*, 2015 WL 5260506, at *4 (quotation marks and internal alterations omitted); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) *cert. denied,* 134 S. Ct. 2871, 189 L. Ed. 2d 833 (2014) (before addressing whether a patent is directed to an abstract idea, the court must first identify and define whatever fundamental concept appears wrapped up in the claim).

### 2.    Analysis

Defendant argues that each of the patents – the Learning Sequence Patents; the Power Level Calculation Patent; and the Fast Start-Up Patent – embody an abstract idea targeted at communicating "signals," "parameters," and "descriptors;" "calculating" power levels; and "initializing" devices using "stored characteristics." Mot. at 13. These are all, Lenovo contends, simply data transfer concepts, dressed up in "patent-ese," lacking any concrete or tangible form. *See id.*

MTS addresses each patent separately. As to the Learning Sequences Patents, it responds that Lenovo misses the point that "the key to the inventions of the '886 and '009 patents is not how an impairment learning sequence is used to detect impairments in the channel once generated . . . , rather, it is how the impairment learning sequence is flexibly constructed by the transmitter (*i.e.*, *before* it is used) in response to specific programming provided by the receiver via a learning sequence descriptor of a particular format." Opp'n at 10. As to the Power Level Calculation Patent, MTS asserts it is not simply a formula to calculate average transmit power but "a patent-eligible application of a mathematical formula to a

specific technological problem." *Id.* at 16. Finally, as to the Fast Start-Up Patent, it asserts it was to be directed towards methods for shortening startup times for a V.90 modem connection, which can be accomplished in more than one way. Opp'n at 20. MTS thus focuses its argument on the point that the patents are truly inventive in nature, through their application to specific technologies, sufficient to extract the patent from the domain of an unpatentable idea. Opp'n at 10, 15. MTS also argues that neither the prior art embodied, nor did prior technology require, the inventive concept put forward by the patents. Opp'n at 17.

### a)      Power Level Calculation Patent and Fast Start-Up Patent

The Court will first consider whether the Power Level Calculation Patent and Fast Start-Up Patent are directed to abstract ideas.

The basic purpose of the Power Level Calculation Patent is to ensure a transmit power limit is not exceeded under certain circumstances. *See* Opp'n at 4–5, 16; *id.* at 17 (explaining the "basic concept" of the '932 patent is "verification of transmit power calculations of a receiving modem by a transmitting modem to avoid exceeding a transmit power limit"); *see* '932 patent at Col. 1:15–17 ("[T]he present invention relates to a data communication system that verifies whether the total average transmit power of a set of signal point constellations is within a designated power limit."). The method set out in Claim 7 of that patent involves: "*determining* a probability of transmission of each signal point of said constellation, *calculating* an average power of said signal points using a power formula based on said probability of transmission of each said signal point; and *comparing* said average power with a transmit power limit." *Id.* Ex. 2 at Col. 12:41–50 (emphasis added). In other words, the Power Level Calculation Patent determines a probability of transmission, calculates an average power, and compares the average power with a power limit. The Power Level Calculation Patent thus embodies using specific formulas to calculate modem power levels in signals transmitted over a data communication channel.

In arguing that the '932 patent is not directed to an abstract idea, MTS emphasizes the '932 patent is not simply a formula to calculate average transmit power, but rather a patent-eligible application of a mathematical formulate to a specific technological problem. Opp'n at

16. However, this argument is irrelevant to the step one analysis. Indeed, the Federal Circuit has explained that "novelty in the implementation of the idea is a factor to be considered only in the second step of the *Alice* analysis." *Ultramercial*, 772 F.3d at 715; *buySAFE*, 785 F.3d at 1353; *see also Hughes Commc'ns*, 59 F. Supp. at 977 ([A]t step one, the Court looks only to the general purpose of the claims, as the Supreme Court did in *Bilski*, *Mayo*, and *Alice*.").[9]

The Court now turns to the Fast Start-Up patent and whether the claims are directed to an abstract idea. The Fast Start-Up Patent's purpose is to provide methods to "shorten startup times" associated with data communication systems. *See* Opp'n at 22; *id.* at 24 (describing the goal of the '022 patent as "shortening the time required to re-establish a connection that had already been previously established"). The specification notes that, to shorten startup time, "[t]he present invention takes advantage of the repeated use of a communication channel between modem devices . . . ." '022 patent at Col. 5:1–3. Specifically, the method described in Claim 1 involves establishing a call between two devices, determining whether a characteristic of the present communication channel is similar to a corresponding characteristic associated with a previously established communication channel, and initializing one of those devices using stored parameters. Put simply, the Fast Start-Up Patent seeks to shorten start-up time between two devices configured devices configured to communicate with each other over a data communication channel by leveraging previously known connections.

General ideas regarding communicating data and mathematical calculations through communication channels, like those underlying the Power Level Calculation and Fast Start-Up Patents, have long been prevalent in our system and relate to fundamental concepts. *Digitech Image Techs.*, 758 F.3d at 1351 ("Without additional limitations, a process that employs

---

[9] MTS' reliance on *DDR Holdings*, which upheld the patentability of a software patent under *Alice*, to argue the patents are not directed to an abstract idea is also unpersuasive. *DDR Holdings* dealt with technology where, "upon the click of an advertisement for a third-party product displayed on a host's website, the visitor [was] no longer transported to the third party's website. Instead, the patent claims call[ed] for an 'outsource provider' having a web server which directs the visitor to an automatically-generated hybrid web page that combines visual 'look and feel' elements from the host website and product information from the third-party merchant's website related to the clicked advertisement." *DDR Holdings*, 773 F.3d at 1257–58. While the *DDR Holdings* court did not expressly state it found the patent was directed to an abstract idea, it implied as much by delving directly into the patent's "inventive concept" without reaching that conclusion. *Id.* at 1257 (without expressly holding that the patent was directed at an abstract idea, noting "under any of these characterizations of the abstract idea, the '399 patent's claims satisfy *Mayo/Alice* step two"). MTS's reliance on *DDR Holdings* to argue that the patents-in-suit satisfy *step one* of the *Mayo/Alice* framework therefore is unpersuasive.

mathematical algorithms to manipulate existing information to generate additional information is not patent eligible."); *Content Extraction*, 776 F.3d at 1345, 1347 (concluding the asserted patents were "drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory"); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) (finding the "process of receiving data from one source . . . , selectively forwarding the data . . . . , and forwarding reply data to the first source . . ." is directed towards an abstract idea). Accordingly, the Court finds the Power Level Patent and the Fast Start-Up Patent are directed to abstract ideas.

### b)      Learning Sequence Patents

The representative claim of the Learning Sequence Patents[10] describes a method of communicating certain descriptors, signals, data, etc. between devices over a data communication channel. The specification of the '886 patent explains that impairment learning may be performed during a start-up procedure associated with a modem system to determine characteristics, including impairments between the systems, so that the modem system can perform subsequent data transmission in an efficient and effective manner. '886 patent at Col. 12:34–45.[11] Defendants emphasize the specification provides that learning sequences "may be suitably modified or configured for deployment in any number of data communication systems," *id.* at Col. 48–50, and that the claims relate to transmitting and receiving learning sequences in *any* communication system, Mot at 5, 6, but that the preferred embodiments and figures are all limited to modems, *id.*

Plaintiff emphasizes the Learning Sequence Patents' claimed parameters and learning sequences are not simply data used to identify the impairment level to be transmitted, but rather that the '886 and '009 patents claim a *process* for allowing the receiver in a communication channel to specify to the transmitter the format of the impairment learning sequence. Opp'n at 11.  Further, Plaintiff asserts that Defendant's characterization of the abstract idea is too general and misses the point of what is claimed in the Learning Sequence Patents. Specifically, Plaintiff

---

[10] Defendant states Claim 1 of the 886 patent as "representative of the scope and breadth of all the remaining asserted claims." Mot. at 6.
[11] The '886 and '009 patents have identical specifications.

argues that "Lenovo's contention that the 'claims liberally involve no more than transmitting and receiving a series of parameters to assess the impairment of a communication channel' mistakenly focuses on the use of the learning sequence (once constructed) rather than the manner in which the learning sequence is constructed *before* such use." *Id.* (citation omitted). Rather, the claimed parameters are used to construct a receiver-specific customized learning sequence. *Id.* at 12. MTS asserts it is the fact that the learning sequence is *customized*, rather than fixed, which transforms it from a simple process of data transmission to a patentable process of flexible data transmission. *See id.* at 11–12. Using flexibly constructed learning sequences enabled "the best signal point constellation for the *given* modem system and the *current* operating conditions to be used," and also "enabled interoperability between transmitting modems and receiving modems made by different manufacturers as well as forward-compatibility with future industry standards that had not yet been adopted." Opp'n at 3.[12]

With this understanding of the Learning Sequence Patents and their goals, the Court finds Defendant has not met its burden of establishing the Learning Sequence Patents are directed to abstract ideas. *See Hughes Commc'ns*, 59 F. Supp. at 978 n.6. The process described by the patents is not sufficiently analogous to any of the Federal Circuit or Supreme Court precedents discussed above. For instance, the process is not like the "ineligible abstract process of gathering and combining data that does not require input from a physical device." *Digitech Image Techs.*, 758 F.3d at 1351. Nor can the process be boiled down to something similar to collecting, recognizing, and storing information. *See Content Extraction*, 776 F.3d at 1345, 1347. The Federal Circuit in *Ultramercial* concluded that "[t]he process of receiving copyrighted media, selecting an ad, offering the media in exchange for watching the selected ad, displaying the ad, allowing the consumer access to the media, and receiving payment from the sponsor of the ad all describe an abstract idea." *Ultramercial*, 772 F.3d at 715. That court

---

[12] The Court also notes that Lenovo emphasizes the flexible and programmable limitations appear nowhere in the actual limitations in the asserted claims. *See* Reply at 3–6. However, during oral argument, MTS responded that the "mere use of a learning sequence descriptor is what makes the claims focused on a programmable line probing technique," and that a learning sequence descriptor would not be used unless it is a flexible system. Mot. for Summary Judgment Hr'g Tr. 38–39, September 28, 2015. The Court thus concludes that the programmable limitation is part of the claim itself; the Court is not inappropriately relying on the complexity of the specification. *See Accenture Global Servs.*, 728 F.3d at 1345.

noted that, "[a]lthough certain additional limitations, such as consulting an activity log, add a degree of particularity, the concept embodied by the majority of the limitations describes only the abstract idea of showing an advertisement before delivering free content." *Id.*

The Learning Sequence Patents similarly involve an added degree of particularity; the Learning Sequence patents involve the *flexible* construction of a learning sequence by the transmitter in response to information provided by the receiver. Unlike in *Ultramercial*, particularly given how the learning sequences are flexibly constructed, the Court cannot now conclude the concept in the Learning Sequence Patent can simply be boiled down to, as Defendant asserts, the abstract idea of transmitting and receiving a series of parameters to assess the impairment of a communication channel. *See* Reply at 5, 9. Based on the evidence and authority Defendant has offered, the Court is unable to conclude at this stage in the litigation that the '886 patent and '009 patent claims are directed to an abstract idea.[13] The Court therefore concludes that Lenovo has not met its burden to show that the '886 and the '009 patents are patent ineligible.

### B.    Step Two of the *Mayo* Test

Because the Court has concluded the Power Level Calculation Patent and the Fast Start-Up Patent are directed to abstract ideas, the Court must now analyze the claims under step two of the *Alice/Mayo* framework.

#### 1.    How Much Is Significantly More?

Under the second step of the *Mayo* test, the Court asks "[w]hat else is there in the claims before us?" *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1297) (internal quotation marks omitted). To answer that question, the Court considers the elements of each claim, individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. *Id.* (quoting *Mayo*, 132 S. Ct. at 1298, 1297) (internal quotation marks omitted). The Supreme Court has described this analysis as a search for an "inventive concept" that "is 'sufficient to ensure that the patent in

---

[13] Although the Court finds Lenovo has not met its burden to show the Learning Sequence Patents are patent ineligible at this juncture, the Court notes this finding is without prejudice to introduce expert testimony at the trial stage.

practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1294). "The transformation of an abstract idea into patent-eligible subject matter requires more than simply stating the abstract idea while adding the words 'apply it.'" *Ultramercial*, 772 F.3d at 715 (internal quotation marks and alterations omitted) (quoting *Mayo*, 123 S. Ct. at 1294). "A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id.* (citing *Alice* 134 S. Ct. at 2355).

Judge Hamilton in the Northern District of California recently provided a helpful distillation of the purposes of the step-two analysis. After conducting a careful analysis of both *DDR Holdings* and *Ultramercial*, she concluded that "the hallmark of the 'inventive concept' test is whether the patentee has added something to the claims to limit their scope, so that they do not monopolize the entire abstract idea to which the claims are directed. This accords with the purpose of § 101's carve-outs for abstract ideas, laws of nature, and physical phenomena, which is to 'ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.'" *Netflix*, 2015 WL 4345069, at *7 (citing *Alice*, 134 S. Ct. at 2355); *see also id.* at *6 ("What stands out in the *Alice/Mayo* line of cases is the courts' focus on preemption as the key concern underlying [] § 101 analyses.").

Whether an abstract process is tied to concrete technology also may help guide the step two analysis. As reinforced recently in *Ultramercial*,

> While the Supreme Court has held that the machine-or-transformation test is not the sole test governing § 101 analyses, *Bilski*, 561 U.S. at 604, that test can provide a "useful clue" in the second step of the *Alice* framework, *see Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) (holding that the machine-or-transformation test remains an important clue in determining whether some inventions are processes under § 101). A claimed process can be patent-eligible under § 101 if: "(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008) (en banc), *aff'd on other grounds, Bilski,* 561 U.S. 593, 130 S.Ct. 3218.

772 F.3d at 716. "To be 'a meaningful limit on the scope of a claim,' the machine 'must play a significant part in permitting the claimed method to be performed, rather than function solely as

an obvious mechanism for permitting a solution to be achieved more quickly.'" *Thales Visionix, Inc. v. U.S.*, 122 Fed. Cl. 245, 256 (2015) (citations omitted).

In *SiRF*, the Federal Circuit upheld the validity of a patent where the claims were directed to a method of calculating an absolute position of a GPS receiver and a method of "estimating a plurality of states associated with a satellite signal receiver" to assist in global positioning in low signal situations. *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010). The "GPS receiver" was held to be a "particular machine" that was "integral to each of the claims at issue." *Id.* at 1332. The Court focused on the fact that the "methods at issue could not be performed without the use of a GPS receiver," and there was no evidence that "the calculations . . . can be performed entirely in the human mind." *Id.* at 1332–33.

However, tethering an abstract idea to some computer technology is insufficient to generate a patent-eligible process. For instance, the "Internet is not sufficient to save the patent under the machine prong of the machine-or-transformation test." *CyberSource,* 654 F.3d at 1370. "It is a ubiquitous information-transmitting medium, not a novel machine." *Ultramercial*, 772 F.3d at 716.  Furthermore, simply adding a computer to otherwise conventional steps does not make an invention patent-eligible. *Alice,* 134 S.Ct. at 2357; *see id.* at 2358 (limiting the use of an abstract idea "to a particular technological environment" is also not enough for patent eligibility) (quoting *Bilski*, 561 U.S. at 610–11) (internal quotation marks omitted). "Any transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis." *Ultramercial*, 772 F.3d at 716–17.

With these precedents in mind, the Court turns to whether Lenovo has presented sufficient evidence to establish that these patents lack a sufficiently inventive concept to transform otherwise abstract ideas into a patent-eligible process.

## 2.    Analysis

MTS argues that, as to each patent-in-suit, the claims are necessarily limited by the technology used to implement the software. Indeed, it was modems themselves that drove the need for the development of each of the patents in suit and commensurately limit their scope.

Thus, MTS emphasizes that the patents are far narrower in their application than Lenovo implies through its oversimplification of the patents. Finally, MTS argues that none of the patents actually preempt the field in which they are applied.

The Court will address each patent and argument in turn.

### a)      Power Level Calculation Patent

MTS emphasizes the '932 patent does not preempt all applications of the concept of allowing a transmitting model to verify the transmit power calculations of a receiving modem to avoid exceeding a transmit power limit. Opp'n at 19. Indeed, MTS asserts, the method in the '932 patent is not the *only* method of calculating an average power of signal points; power calculation formulas that do not assess the individual probability of transmission of each signal point could be used instead. *See* Opp'n at 6 ("For example, IBM and RSA Communication's proposals both assumed that each signal point in a constellation had an equal probability of transmission.") Further, MTS notes the '932 patent does not claim transmit power level verification using any power calculation formula, but specifies a type of power calculation formula that is based on the probability of transmission of each signal point. *Id.* MTS argues Claim 8 of the Power Level Calculation Patent adds a further narrowing limitation regarding calculating an average of averages when multiple constellations are used. *Id.* at 19.

MTS further contends that '932 patent is a

> patent-eligible *application* of a mathematical formula to a specific technological problem, namely, how to ensure that a transmit power limit is not exceeded when the signal point constellation used are flexible rather than fixed by calculating, on both digital and analog modems, an average power of a transmission using a plurality of signal points based upon the probability of transmission of each signal point, comparing the calculated average power with the transmit power limit (Claim 7), and transmitting the signal point constellation over the communication channel (Claim 11).

Opp'n at 16–17. MTS also asserts that Claims 8 and 9 are also a patent-eligible application of a mathematical formula to a specific technological problem. *Id.* at 17. According to MTS, a method of calculating an average power of signal points need not be performed using multiple

constellations and thus Claim 8 contains an inventive concept and adds significantly more to the alleged abstract idea. *Id.* at 20.

Lenovo argues that the asserted claims of the Power Level Calculation Patent fail to identify any additional feature that transforms the abstract idea into a patent-eligible invention. To support this assertion, Lenovo points to the specification itself, which states that "conventional 56 kpbs modem systems perform constellation design and power calculation at the analog modem (i.e., the client-end modem) after obtaining a maximum power limit from the digital model (i.e., the server-end modem)." '932 patent at Col. 2:24–29. Citing the V.34 standard, Lenovo further asserts that calculating the power levels using a constellation is conventional and has existed in modem technology for some time. Mot. at 17 (citing Trusso Decl. Ex. 11 at 28–30). Similarly, Lenovo states the concept of calculating power limits of a communication channel was a well-known principle at the time of the invention. Motion at 21. Lenovo emphasizes Sverrir Olafsson's, the patent inventor, testimony that "most digital communication systems" restrict power transmit levels. *Id.* Ex. 7 ("Olafsson Deposition") at 171:14–24.

As the Court previously emphasized, Defendant bears the burden of making clear "[t]he line between a patentable 'process' and an unpatentable 'principle'" in the context of Plaintiff's patent claims. *Flook*, 437 U.S. at 589. Based on the record before it, the Court cannot conclude that Lenovo has shown the '932 patent is not sufficiently inventive. Unlike in *Ultramercial*, the Court cannot conclude "the claims simply instruct the practitioner to implement the abstract idea with routine, conventional activity." 772 F.3d at 715. It is also not apparent that the "claims' sequence of steps comprises only conventional steps, specified at a high level of generality, which is insufficient to supply an inventive concept." *Id.* at 716. For instance, Claim 8 states: "The method of claim 7, wherein said method uses a plurality of signal points, and wherein said total includes a plurality of signal points, and wherein said total power of each said constellation is calculated and further averaged to generate an average total power." '932 patent at Col. 12:51–55. The Court is unable to conclude that those steps are conventional or specified at a high level of generality.

Further, it appears that the claims in the '932 patent are more like those at issue in *DDR Holdings*, in which the court concluded the claims "do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same," but instead recited "a specific way to automate the creation of a composite web page." 773 F.3d at 1259. Here, it appears the claims cover only one "specific way" to calculate an average power of signal points. Indeed, a power formula based on the probability of transmission of each signal point is not necessary to achieve the '932 patent's goal. In addition, by disclosing a "specific way" to calculate an average power of signal points, the claims appear to constitute "more than a drafting effort designed to monopolize the abstract idea." *Id.*

In light of the foregoing, the Court cannot conclude at this stage that Lenovo has met its burden of showing the '932 patent is not sufficiently inventive, rendering it patent ineligible.[14]

### b)        Fast Start-up Patent

MTS asserts the '022 patent is sufficiently inventive because it is limited to a particular technology, specifically V.90 modems. The process described in the '022 patent, therefore, is "necessarily rooted" in that technology. Further, MTS asserts it does not preempt the field, because the fast startup problem could also be addressed "by simply assuming that the current connection sought to be established was the same as the previous connection that was established, and simply performing a full startup sequence if this turned out to be false." Opp'n at 23. For that reason, MTS argues Claim 1 does not preempt all the ways of performing fast startup; to perform a fast start up, the modem system "could simply assume the connection was the same and initiate a shortened startup procedure, reverting back to the long procedure in the event of failure, or the modem system could use RLS or other faster startup algorithms." *Id.* MTS next asserts that Claim 2 contains "the further limitation" of an initial check to determine whether both the digital modem and the analog modem support fast startup. *Id.* Claim 7, MTS adds, "further requires" that the fast connect identifier serve a dual function related to impairment learning as well as fast startup. *Id.* Claim 10 requires that the channel characteristics "to be compared are digital impairments associated with the current and

---

[14]As with the Learning Sequence Patents, the Court notes this finding is without prejudice to introduce expert testimony at the trial stage.

previously established channels." *Id.* None of these additional limitations would be required to practice Claim 1, MTS asserts. *Id.* MTS argues all of the claims therefore contain an inventive concept.

Lenovo asserts the invention simply "takes advantage of the repeated use of a communications channel between modem devices," Mot. at 22 (citing '022 at Col. 5:1–3), which does not add "significantly more." Lenovo also argues that MTS conflates the preemption analysis with the "inventive concept" analysis, and asserts that submitting alternative proposals submitted by competing companies that add, remove, or modify a step of a process "does not take away from the fact that the process itself is an abstract idea lacking any inventive concept." Reply at 10–11.

The Court finds that the fact that the fast start-up problem arose, in this circumstance, as to the V.90 modems does not add significantly more to the abstract idea of determining whether a current communication channel is the same as a prior communication channel to facilitate quicker startup, essentially, maximizing startup speed between devices. *See Open Text S.A. v. Box, Inc.*, 78 F. Supp. 3d 1043, 1049 (N.D. Cal. 2015) ("[T]he unpatentability of abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment,' despite the fact that doing so reduces the amount of innovation that would be preempted.") (quoting *Diehr*, 450 U.S. at 191).

Further, adding related steps and further calculations described above – for instance, Claim 2's step of ascertaining whether the devices support the fast connect protocol before the system compares channel characteristics – does not add significantly more to the abstract idea. Rather, the steps "merely instruct[] the practitioner to implement the abstract idea with 'routine, conventional activit[ies].'" *Ultramercial*, 772 F.3d at 716 (citing *Mayo*, 132 S. Ct. at 1298) (second alteration in original)); *Gametek LLC v. Zynga, Inc.*, No. CV-13-2546 RS, 2014 WL 1665090, at *6 (N.D. Cal. Apr. 25, 2014) *aff'd*, 597 F. App'x 644 (Fed. Cir. 2015) ("[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable.") (quoting *Mayo*, 132 S. Ct. at 1300) (internal quotation marks omitted). The asserted claims thus

differ from those at issue in *Hughes Communications*, in which the court concluded that, "[d]espite being generally directed to abstract concepts, the asserted claims contain meaningful limitations that represent sufficiently inventive concepts." 59 F. Supp. 3d at 944.

In addition, MTS' argument that there are other ways to address the fast startup problem is unavailing in light of the foregoing. The Court "is not required to anticipate the number, feasibility, or adequacy of non-infringing alternatives to gauge a patented invention's preemptive effect in order to determine whether a claim is patent eligible under section 101." *Open Text S.A.*, 78 F. Supp. 3d at 1049. In *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, the Federal Circuit concluded the patentee's "attempt to limit the claims by showing alternative uses of cffDNA outside of the scope of the claims does not change the conclusion that the claims are directed to patent ineligible subject matter." 788 F.3d 1371, 1379 (Fed. Cir. 2015). Just because the fast startup problem could be addressed in another way does not guarantee the patent has added significantly more such that it is not patent-ineligible subject matter. *See Tenon & Groove, LLC v. Plusgrade S.E.C.*, No. CV 12-1118-GMS-SRF, 2015 WL 1133213, at *4 (D. Del. Mar. 11, 2015) ("Leaving open some avenues with which to practice the underlying idea . . . does not guarantee patent eligibility."); *Ariosa*, 788 F.3d at 1379.[15]

Accordingly, as to the '022 patent, the Court finds that the process described is patent ineligible under § 101.

---

[15] As noted above, MTS asserts the fast startup problem could be addressed by assuming the current connection sought to be established was the same as the previous connection. Opp'n at 23. If this assumption turned out to be false, a full startup sequence would then be performed. *Id.* This alternative seems less like a true solution and more like a "do nothing" approach. The Court is therefore concerned the asserted claims will preempt all the ways of shortening the time required to re-establish a connection that had already been previously established.

## IV.    DISPOSITION

The Court therefore:

- DENIES Lenovo's Motion as to the '886 and '009 patents;
- GRANTS Lenovo's Motion as to the '022 patent; and
- DENIES Lenovo's Motion as to the '932 patent.

_David O. Carter_
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

Dated:  December 2, 2015